Mary, can you call the next case? Case number 14-3822, Excel Entertainment Gaming v. Village of Elmwood Park. Thank you. Counsel's approach appointment, please. Good morning, Your Honor. Seth Horvath for the appellant, Excel Entertainment Gaming LLC. Okay, thank you. Good morning, Your Honor. Benjamin Jacoby for the appellant. Okay. All right. Provider parties have 15 minutes apiece and some time for rebuttal. We've got two minutes for rebuttal. Two minutes for rebuttal? Okay. All right. Thank you. Your Honor, if it pleases the court, I'll proceed with my remarks. Yes, please. We've challenged the constitutionality of Elmwood Park's video gaming ordinance. It's a regulatory ordinance. Among other things, it gives the village authority to supervise video gaming in Elmwood Park. It requires video gaming terminal operators to obtain a village license. It caps the number of video gaming terminals in the village. It requires confidential financial disclosures from terminal operators. It charges a tax of $1,000 per year per video gaming terminal on the operators. And it grants the village unrestricted access to the licensee's premises and vehicles. Did the village exceed its authority here with regards to this licensing pursuant to the Elmwood authority? That's our argument, Your Honor. The ordinance gives the village the exact same regulatory authority as the state of Illinois. And the state, in this instance, under the statutory scheme, is charged with regulating video gaming. So the first issue we have here is did the circuit court commit error by finding that we failed to state a claim that the ordinance exceeds the village's Elmwood authority under Article 7, Section 6A of the Illinois Constitution? We were dismissed out under 2615, so we're here de novo. On that issue, we're asking the court to follow the three-factor test from Caledemos and StubHub and Bridgeview, the cases that we've cited in our briefs. You're also asking us to reverse our previous decision, really, aren't you? That's not what we're— Back off, Midwest. That's not what we're—the Midwest gaming case raises a separate series of issues that we're not dealing with here. There's two sets of issues in this case. One is the regulatory issue under Section 6A. The second is a set of taxation issues involving a challenge to whether the village's $1,000 per terminal tax is an impermissible occupation tax, license for revenue, or violation of— Did we consider similar issues, though? The taxation issues were absolutely considered by the Midwest case, and we concede that we're not on a blank slate because this division just considered those taxation issues. But the regulatory question under Article 7, Section 6A that requires the court to consider those three factors from Caledemos, StubHub, and Bridgeview was not addressed in the Midwest case because the ordinance in Midwest was purely a taxation ordinance. It had none of the regulatory components that the village is— What about the regulatory component of this? I mean, doesn't the village have authority to be able to regulate gambling within its boundaries? The village has regulatory authority over certain things, but the question is whether that regulatory authority exceeds limitations on home rule. And because commercial gambling, which includes video gaming, is an area that falls outside the scope of home rule authority, the village can't climb and do what the state does. Why does it fall outside? Because under those factors that we're going to discuss with the court, video gaming is a state issue. It's not a local issue. The test is whether— But doesn't it really vote? It's really something for the state, Your Honor. And the reason for that is because— What case says that? There's no particular case that deals with gambling issues per se under this three-factor analysis. Well, wait, wait. You're making a constitutional challenge here. Correct. Okay, what type of constitutional challenge are you making? This is a facial challenge. A facial challenge. And in a facial challenge, a court examines whether the statute or the ordinance contains an inescapable flaw that renders the statute unconstitutional under every circumstance. That's right, Your Honor. So you're saying that under every circumstance, this is unconstitutional. That's correct, because the village is taking the authority of the Illinois Gaming Board, and it's using that authority to regulate, which it can't do. But when you say taking the authority, what case can you show us that says so? Your Honor, there's 115 years of Illinois case law that show that the state of Illinois has exclusive regulatory authority over commercial gambling. Video gaming is the most recent addition to this area of commercial gambling. I have never found one case that says that. So show me one. And what about 115 years? This notion that the state exclusively regulates commercial gambling dates back to the late 1800s. And what case in particular are you directing us to? It really starts with statutes, Your Honor. There's a whole series of statutes that regulate gambling and horse racing and the Illinois Lottery. And the enactment of those statutes began in the late 1800s. Yeah, but there's no case that says that only the state can do it. But, Your Honor, the court has to look at the relevant history within the state statutes and regulations, and it has to decide for itself whether this is an area, this area of commercial gambling, is a carve-out that falls outside when we're heard. Courts do this all the time. Do you know the history of home rule, why home rule was enacted, and when it was enacted? Under the Constitution of 1970, municipalities were given the ability to engage in home rule regulation. But there are limitations on that regulatory structure. One of the most important limitations is in Article 7, Section 6A, which says that for a municipality to regulate, the regulation has to pertain to its local government and affairs. It's a pretty broad concept. It is a broad concept, but it's one that courts have consistently examined to carve out whether the subject matter being regulated does, in fact, fall within the province of the municipality. What are some of those? What are the ones that have been permissible? There are a number of areas. The question is, which ones have been barred? No, no, let's talk about the ones that haven't been barred. The areas that a municipality can, in fact, regulate. Where the state is also involved, to some extent. There's various areas where there's overlap between municipal regulation and state regulation. You can probably apply that under most areas of the law, but there are discrete areas. There are discrete areas like this one where the municipality can regulate. And some examples, and I think this is a helpful series of examples, and it shows that the case law has addressed this for the last hundred years. Some examples are banking cannot be regulated by localities. The court system can't. Well, that's the same with the National Banking Act. But there's also a state home rule limitation on that, Your Honor. And there's further examples. The court system also cannot be regulated by local municipalities. Various areas of state substantive law, like contract law, wills and trusts, property law, can't be modified by local municipalities. Most recently, just a few years ago in 2011, the Illinois Supreme Court said that online ticket sales can't be regulated by the city of Chicago because that type of ordinance interferes with state law and exceeds the city of Chicago's home rule authority. This court just decided in 2014 a case that struck down an ordinance that the village of Bridgeview passed that tried to say that people in Bridgeview couldn't operate what are known as feral cat colonies. That's simply a business or a concern where someone takes care of wild cats. But wasn't that more in terms of they were affecting not only their own boundaries, but they were affecting the boundaries of other municipalities around Bridgeview? That was one consideration, Your Honor, but the same consideration applies here. Commercial gambling and video gaming are statewide issues. Video gaming, which is part of the framework of the Video Gaming Act, is controlled by a statewide computer system. It's interconnected. The state closely monitors every aspect of video gaming. Terminal operators, like my client Excel, operate on a statewide basis. I have a question regarding the legislation. If the state legislature wanted to specifically exclude municipalities from controlling gaming within their borders, wouldn't it have specifically set that out in the Act? It doesn't specifically state that municipalities cannot also control gambling within their borders. The Video Gaming Act doesn't say that they can't, nor does it say that they can't. And the reason for that is... But they can't do it without expressly saying so. Well, Your Honor, that's only partially true in that the Section 6A pertains to analysis is different from a preemption analysis under the Constitution. Before a court gets to asking whether certain municipal regulation has been expressly preempted, the court has to look to whether the underlying area being regulated even pertains to local government and affairs in the first place. That's the analysis that the StubHub case sets forth. That's the analysis that the Bridgeview case followed. The bottom line is that the Illini Constitution says that under the Home Rule authority, you have the power to regulate for the protection of public health, safety, and the general welfare. And the Constitution says, right after that, to license, to tax. It gives all the examples. This is tax. It's right there. Well, there's the police power, Your Honor, in the Constitution. And even when a municipality acts pursuant to the police power, the use of the police power still has to pertain to local government and affairs. That's the way Section 6A is based. Safety and general welfare. You don't think that that comes under general health? Safety and general welfare to be able to control the gambling in your town? Even if it does, commercial gambling is an area that has to pertain to local government and affairs. And because of the backdrop, the history, with exclusive state regulation of commercial gambling, the state is exclusively in control of this area. The local government can't be the first. Well, I know you're saying that, but I have not found any cases in any state in the United States of America that says that. I've looked at every state. We've actually cited, Your Honor, one case from another jurisdiction that does deal with a similar issue. It's a Pennsylvania case where, similarly, there was a local regulation regarding video gaming. And under Pennsylvania home rule law, the Pennsylvania Supreme Court said that that attempt to regulate video gaming fell outside the scope of Municipal Authority. Because they didn't have the same constitution that we have. It's not the same wording. That's what the difference was. They do have a different constitutional structure, but the wording in our structure necessitates that analysis, that consideration of these three factors from the cases that started in the United States of America. But it says right in the Constitution that they have the right to tax. I mean, you know, you have to be able to show us that, you know, this is really not a tax. This is something else, we call it. Your Honor, I want to, to answer your question, there's a different analysis that applies to regulation and taxation. The Midwest case dealt with those taxation issues under Cook County's attempt to impose a tax on the video gambling machines at Rivers Casino. This case poses a completely different set of issues because the Villages Ordinance goes beyond the $1,000 per terminal tax. The Villages Ordinance caps the number of video gaming terminals that can operate in Elmwood Park. There's no similar cap under state law. The Villages Ordinance requires an independent village license. That means even if an operator has a... And what's the reason behind, would you say, capping the number of those video machines located in the village? The village has not proffered a reason for the cap. What do you suppose the reason is? Because they're reaching out... There might be too many? They're reaching out and making an independent determination on how many machines are permissible when they don't have any authority to do that. The statutory structure gives the gaming board the exclusive right to go out and enact these regulations. But doesn't that act also provide an opt-out clause with regards to a municipality can say, we don't want to have gambling within our borders? That's a key point, Your Honor, because the opt-out clause lets a municipality say, we do not want to participate in this scheme. When the municipality opts in, our point to the court is that it submits itself to state regulation by the gaming board. That regulation is exclusive regulation that furthers important state interests and has to be looked at against the backdrop of this 125-year history of exclusive regulation of commercial gambling. I wanted to address the point Your Honor made about monitoring criminality within the municipality. First and foremost, we don't think that that point is well taken as an argument by counsel in the context of the 2615. We don't have to rebut their contentions about controlling criminality or whether that's an issue in the context of stating our own affirmative claim. But the research, the studies that have been done, actually bear the opposite conclusion. The studies the state has performed show that when video gaming is instituted in a municipality, it actually reduces the incidence of criminal gambling. So to the extent they're attempting to justify this ordinance on the basis of regulating criminal conduct that originates with video gaming, that's simply not borne out by the facts in question. Let me go back to the Act. So there also is a provision in the Act that allows non-home rule entities as well, right? And there's a control issue there. That's right, Your Honor. The provision that you're referring to gives non-home rule municipalities authorization to impose a certain tax on people who are regulated under the Act. That's only something that goes to the taxation question. And in addition to that, the authorization… That's the issue about what you can do within your own borders? I don't think it does because the authorization of a home rule municipality to tax actually implies that home rule municipalities are excluded from taxation. If you read that specific authorization that applies to home rule municipalities, the proper interpretation of that is that it's silent on what home rule can and can't do. And that's where the court has to fill in the blank that this pertains to analysis under Section 6A. So that particular provision of the law only goes to non-home rule municipalities. We can't read in from that that home rule municipalities have also been allowed to tax. And even if we were to, it would only resolve the taxation issue. It wouldn't resolve the broader regulatory issue, which is really what we're concerned with. Because if Elmer Park is allowed to do this, if other municipalities adopt this scheme, you could have displays come in and shut down Rivers Casino. You could have Joliet decide to cancel operations at Harrah's based on a licensing violation. You could have 200 plus independent local gaming boards throughout the state of Illinois because each home rule municipality could exercise its own authority to regulate this area of the law. And we submit to the court that that is not permissible. And we would ask that the court reverse and vacate the dismissal order that was entered below and reinstate our lawsuit. I'm cutting into my rebuttal time, Your Honor, so unless there are further questions, I will take a seat. Thank you. May it please the court. Morning. Good morning. Your Honor, this panel is very familiar with Midwest Gaming because this panel decided it. Justice McBride raised a valid point. Ruling in favor of Excel in this case essentially overrules Midwest Gaming. The reason is because although Midwest Gaming was a taxation case, to get to the taxation issue, the court first analyzed the home rule analysis. And the court conducted a very lengthy and thorough analysis of home rule authority and concluded that because the matter pertains to a home rule to the local government and affairs, the underlying issue of the gambling machines can be taxed by the home rule unit. And the court relied on town of Cicero in getting there because town of Cicero did essentially the same thing. And the town of Cicero case, the Fox Valley racetrack, raised a very similar argument. They said, okay, home rule units have the power to tax. We can see that the tax revenue is going to a matter of local concern, but they can't tax us because we're a horse track and that's a matter of state concern. And town of Cicero said, no, that's not right. We disagree with that. And although this isn't a regulatory case, the horse racing is both a statewide industry granted, but also a local amusement. And just the same as the gaming terminals in Midwest were local amusement subject to tax because of the home rule authority of Cook County. The video gaming terminals in this case are subject to regulation because, as your honors also pointed out, home rule units have absolute power, the broadest power conceivable to regulate those things that pertain to local government and affairs. So does it make a difference if we have a licensing fee here or a tax? I mean, is it the same thing? In terms of our analysis here? In terms of the home rule analysis, no. Once you have home rule authority, you can regulate the public health, safety, welfare. That's under 6A. So you can regulate, you can tax, you can license, you can incur debt. So once you have something that pertains to local government and affairs, you can do those four things. So you can regulate. Elmwood Co. Chapter 57 does the regulations. And you can license, which it does under Chapter 29, the business license. And then it can also tax, although it doesn't in this case, but Cook County did. So that's how we get there. The fact that Elmwood Park's fee is a fee and not a tax was only relevant in terms of the argument that it's not reasonably related to the regulations, which was never pled in the circuit court. That wasn't an argument that Excel put forward, because Excel put all its eggs in the basket of this is a tax, tax is impermissible, and we know from the arrest now that that's not true under these circumstances. I do want to address Section 65, which Your Honor has brought up just a moment ago. Section 65 of the Video Gaming Act is the section that holds that non-home rule units are entitled to charge a $25 fee, not tax. I believe there was a misstatement. It's a fee, and that's what Section 65 does. The General Assembly had to grant that power to non-home rule units, because under Article 7, Section 7 of the Constitution, non-home rule units are not allowed to regulate unless they're expressly granted the authority to do so. So the General Assembly expressly granted the authority to non-home rule units to charge a fee. And as we know from many cases, including one cited A&H vending, fees must be reasonably related to regulations. Ergo, non-home rule units are authorized to do so. But what does that have to do with this case? Because, Your Honor, if non-home rule units are allowed to regulate, then so must home rule units. It doesn't make sense any other way. If under Excel's version, if video gambling does not pertain to a case that is a non-home rule unit, what case is that? I'm sorry. What case says what you just said? It comes from the Constitution. Where? Section 6A. So Section 6A grants the broadest powers to home rule units to regulate. And if non-home, it's intuitive, too, Your Honor. It doesn't make sense if a non-home rule unit is allowed to regulate that home rule units are not allowed to regulate. Since it could regulate for public health, safety, morals, and general welfare. That's what it says. Exactly, Your Honor. You're analogizing this particular provision to suggest that if a non-home rule unit can impose a fee, that that would then make sense that the village that actually has home rule powers can obviously regulate it. Within its own jurisdiction. That's exactly what I'm saying, Your Honor. It doesn't make sense. There's no case that says that. You're just using the Act to suggest an analogy. That's exactly what I'm doing, Your Honor. Thank you. Also, the Act doesn't expressly preempt home rule authority, as Midwest conducts a very thorough analysis of, except to the extent that it incorporates the Riverboat Gambling Act and the provision in the Riverboat Gambling Act that expressly preempts a home rule authority from regulating the hours that the casinos can sell alcohol. That's the only part in either of the two Acts that home rule is even mentioned at all. In that case, the General Assembly has expressly, very expressly, using the word home rule, preempted the home rule's authority to regulate the alcohol. Because that express preemption isn't contained anywhere else in the Act, we know that the General Assembly knows how to do it. The General Assembly didn't do it elsewhere. The home rule authority has the ability to then regulate. I do want to discuss Calodimos for just a minute, because I think it also supports the home rule authority that Elmwood Park has in this case to regulate video gambling. And the reason is because in Calodimos, what was regulated was handguns. And the Calodimos court said handguns are a matter of local concern, local government and affairs. And it went through analysis. And one of the things it looked at was handguns. It was concerned that handguns would increase crime, or handguns would increase the propensity of accelerating crime. And crime was an issue. That's a local issue. And to the extent that handguns applied to crime, a local issue, they could be regulated. The same is true here. And although counsel cited some stats, we can hypothesize that if gambling is prevalent in the community, that crime will increase, and not just gambling crime. I think the stats that he cites actually relate to whether or not illegal video gaming is taking place. But we can also hypothesize that fighting in bars where gambling is taking place, pickpockets, robberies, at least an increased call of disturbances to the police department will take place if there is no regulation. And for that reason, gambling also pertains to a matter of local concern. Something else the Calodimos court looked at was the effect on children. It was concerned that guns in the community would be attractive but dangerous instrumentalities to children. And I can't think of anything else more attractive and dangerous than a wheel of fortune gambling machine with lights and bells that children want to play because it's a video game. Well, it's also gambling. It's dangerous. Were there expert affidavits in the lower court that said all these things that you're arguing before us? No, there weren't. Well, if it's not in the record, then how can we consider it? Because this is a facial challenge. And as a facial challenge, if you can think of one set of facts that allows this regulation to be constitutional, then the regulation is constitutional. Shouldn't that have been done in the lower court? We did make these arguments in the lower court, Your Honor. How many did you have affidavits, experts, that shows what happens when you have gambling? We didn't need them, Your Honor, because on a 2-6-15. You didn't need them? We did not need them for the 2-6-15 motion to dismiss based on the facial challenge because all we had to do was hypothesize. And that's what we did. And the judge recognized that. So we have potentially increased crime, potential harm to children, potential addictive behavior in the community, and just the machines, the gambling being woven into the fabric of the community. We have machines popping up in mom-and-pop bars and restaurants, pool halls, taverns, billiards of VFWs, Masonic Lodges. These are the places that people congregate after work. This is where families go. And for this to be within our community, that goes to the nature and extent of the problem. That's something else that the Caribbean was looked at. So this is something that's very much part of our local government and affairs. What about the argument that to allow these machines includes, you know, brings in tourism, brings in dollars, which is vital to the state? Your Honor, that goes to the vital state interest. That was a Caledemos factor. Caledemos asked which unit of government. Isn't that important for our consideration? Your Honor, if those are vital state interests that can preclude regulation of a subject matter, then parades, festivals, even restaurants, those also perpetuate tourism, revenue development. Those things would also be such a statewide concern, such a vital concern of the state, that they would not pertain to local government and affairs. So those interests are broad, and they're too broad. Well, how about counsel's argument that if you give the municipality powers over gambling, they could take a casino like Des Plaines and just close it down? Well, Your Honor, two points. First, Des Plaines does zone the casino. I mean, there is some level of regulation over the casino. There's special zoning for the casino. Niles zones the OTB. Des Plaines also issues special liquor license for the casino. So there is some level of regulation. But casinos are different. I mean, casinos are different. So you're talking about zoning. Is there a special use with conditions attached? Do you know that? I don't know, Your Honor. Probably don't. I mean, but the point is that there is some oversight, and that's why they can't put up two casinos because Des Plaines probably doesn't want two casinos. We can't zone these video gaming terminals because they're popping up all over the place. And if we have no control to limit the number of them, they show up on every bar, you know, on every corner. If one bar has one, the next bar has to have one, too, because the patrons will go there. How about Counselor's argument that, you know, there's been a history in public policy that the state regulates gambling, not the municipality? Well, two things again. Palm and Roman expressly say that, you know, comprehensive historical regulation, those aren't the end of the game. You can have concurrent regulation under six I's. The analysis starts, does it pertain to, is it expressly exempted? If not, then there's concurrent regulation. But the historical aspects, video gaming just came out in 2009. Elmwood Park's code statute came out in 2013, so it wasn't far behind. So video gaming is brand new. And also, Elmwood Park has regulated gambling ever since its code was enacted in 1943. It has specific provisions making certain gambling illegal and controlling the raffles and the lotteries and so forth in Elmwood Park. So it's just not true that gambling has always been regulated by just the state. The local municipalities have played a hand in this, too. Your Honor, I think my time is just about up. Unless there are any other questions, we would ask that this Court affirm the dismissal of the circuit court. Thank you. Your Honor, in rebuttal, on 2615, the standard is not whether they can hypothesize alleged facts to rebut our claims. The standard is whether we've alleged sufficient facts to state a claim. And as we've explained in our briefs, we've alleged facts that fulfill those three factors of the Karadimos analysis. So we don't think that their argument about criminal conduct is well taken. Even if it were, we've suggested to the Court, as I explained, that there are studies that show the opposite. They also said in their argument, Your Honors, the police said that we put all of our eggs in the basket of taxation. And that is decidedly not the case. Count three of our complaint is devoted entirely to this issue of whether the ordinance violates Article 7, Section 6A. And the Midwest decision expressly recognizes that Midwest was a tax case. In paragraph 66 of that opinion, the panel said, here it is the tax itself at issue and not any regulatory ordinance. Counsel also referred to the Cicero case as support for the position that a municipality can regulate video gaming. Cicero was, like Midwest, a tax case. It didn't have a regulatory component. So Cicero doesn't inform the analysis here of whether Elmwood Park can enact a comprehensive regulatory ordinance on which a single small component is the tax. To Counsel's point about what, as an example of displayings, can and cannot do with respect to Rivers Casino, zoning was the example that Counsel used. Zoning is totally different from licensing commercial gambling. So the example Counsel put forth to the court is that displayings already regulate by zoning ordinances. But it simply isn't applicable in the licensing setting, which is what we're talking about before the court. Also on the issue of historical municipal regulation, Counsel cited the 1943 gambling ordinance that Elmwood Park has put into effect. That ordinance has nothing, nothing to do with licensing or regulation. It defines certain criminal offenses that have already been criminalized under state law and regulates criminal conduct. It's a totally separate area of regulation. What about the provision regarding the non-home rule unit of government that may not impose any fee for the operation of a video gaming terminal in excess of $25 a year? We submit, Your Honor, that the way that provision has to be read is that by expressly granting that authority to a non-home rule unit, the court cannot imply that it grants anything or recognizes anything on behalf of a home rule unit. So by listing that explicitly, it excludes any reference to a home rule unit. Moreover, it has nothing to do with regulatory authority. It's only a provision about taxation. I also wanted to briefly comment on Counsel's arguments about the Liquor Control Act. The Liquor Control Act has over 175 references to municipal and local control. It is not a predicate for determining that video gaming and commercial gambling should be regulated locally. It's a completely separate statutory scheme that is irrelevant under the facts of our case. One more point, Your Honors, regarding the interests in the statute, the state interests that are set forth in the Video Gaming Act. Elgin Park is simply trying to second-guess those legitimately stated state interests. They're outlined clearly in the Video Gaming Act and the River Road Gambling Act, and the courts have to defer to the interests the state has identified in operating video gaming under exclusive state control. If Your Honors have no further questions. I just want you to sum it up for us and tell us in a nutshell, how is it that this home rule is excluding or preempting the regulations? There's a 110-year backdrop of exclusive state control over commercial gambling. Video gaming fits into that backdrop. There's no reason to make any special exceptions. I mean in the language of the Gaming Act. In the language. Doesn't it have to expressly state? No. Your Honor, the Video Gaming Act does not expressly have to exclude local control. It may. The state may expressly preempt something, but under the analysis in StubHub and under the analysis in Bridgeview, there's a two-part test for determining whether or not a municipality can impose a certain regulation. The first step in that analysis is the pertains to analysis under Section 6A. Okay. If the regulation pertains to. Which does it pertain to? That's correct. That's correct, Your Honor. We're not addressing the preemption part of the test except with respect to the tax. Okay. Except with respect to the tax. Any further questions, Your Honors? No. Okay. Thank you very much. Okay. I want to thank counsels for a well-argued matter, and this court will take this under advisement. Thank you very much.